IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 12, 2017 Session

**STATE OF TENNESSEE v. FREDERICK D. CURLL**

**Appeal from the Circuit Court for Williamson County**
**No. II-CR-068067   Deanna B. Johnson, Judge**

_____

**No. M2017-00090-CCA-R3-CD**

_____

A Williamson County Circuit Court Jury convicted the Appellant, Frederick D. Curll, of aggravated cruelty to an animal, a Class E felony, and the trial court sentenced him as a Range II, multiple offender to four years in confinement.  On appeal, the Appellant contends that the trial court erred in its jury instruction of "sadism," that the evidence is insufficient to support the conviction, and that he received the ineffective assistance of counsel because trial counsel failed to call a veterinary expert to testify on his behalf and failed to file a motion to suppress the officer's search of his back yard and seizure of the animal's body without a warrant.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., and FRANK G. CLEMENT, JR., SPECIAL JUDGE, joined.

Drew Justice, Murfreesboro, Tennessee, for the appellant, Frederick D. Curll.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Kim R. Helper, District Attorney General; and Tammy Rettig, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, Officer Scott Franklin of the Williamson County Animal Control Department testified that on February 16, 2014, he responded to a complaint of a deceased dog in the back yard of a home on Walnut Drive in Franklin.  When he arrived, Officer Franklin could not see into the back yard from the road, so he "made contact with

a juvenile" at the home. An adult was not present, so Officer Franklin obtained the name and telephone number for the juvenile's mother, LaTonya Curll. Officer Franklin left the home and tried telephoning Mrs. Curll. She did not answer, so Officer Franklin left her a voicemail.

Officer Franklin testified that he later returned to the home and talked with Mrs. Curll. He stated:

> I just let her know why I was there; what the complaint was. And she informed me that she had left to go get a shovel to take care of it. And I asked her if we could go look at what was going on. And she led me to the back yard.

Officer Franklin said that he and Mrs. Curll "walked back there," that he saw a dog "chained" to a tree, and that the dog appeared to be deceased. He also saw a doghouse in two pieces, a metal food pan, and a metal water pan. Both of the pans were empty and dry, and very little feces was in the area "for an outside dog." Officer Franklin described the dog as a medium- to large-size dog and said that it looked like a Rottweiler or Rottweiler mix, which was usually "a toned, solid dog." However, the deceased dog "appeared emaciated," and Officer Franklin could see the dog's ribs and hip bones. He said that the dog was "very, very thin" and that he suspected the dog had been neglected.

Officer Franklin testified that another Rottweiler was in the back yard and was "secured to the left hand side of the residence where it could come and go off a side porch maybe." The second dog's body was in "great" condition, and Mrs. Curll told him the dog belonged to her. Officer Franklin collected the deceased dog as evidence and transported it to Animal Control.

Officer Franklin testified that on March 4, 2014, he talked with the Appellant, who was Mrs. Curll's husband, about the deceased dog. The Appellant told Officer Franklin the dog belonged to Darius Lee. Lee did not live with the Curlls but was supposed to come to their house at least one day per week to "tend to" the dog. Officer Franklin asked the Appellant "about the other six day[s]." The Appellant did not give him a definitive answer and "wanted to talk about how the dog used to get loose and roam at large and that the Franklin Police Department had to bring it back to his residence at least once." The Appellant told Officer Franklin that he told Lee to come and get the dog but that Lee never did so.

On cross-examination, Officer Franklin testified that he later spoke with Darius Lee. Lee said that he owned the dog but that he was keeping it at the Appellant's house with the Appellant's consent. Lee last saw the dog on February 5 or 6, 2014, and the dog

"looked fine" at that time. Officer Franklin wrote in his report that "[Lee] stated that [the Appellant] had asked [Lee] to come and get the dog because it was getting loose and roaming, with the Franklin Police Department actually bringing it back a couple of times." Defense counsel asked Officer Franklin why he did not charge Lee with a crime, and Officer Franklin answered, "He did tell me the dog was his, but he also told me that it was being kept at Mr. Curll's house, who agreed to tend to it, with a kickback once in a while -- like he would give Mr. Curll some money since the dog was there." Officer Franklin acknowledged that while he thought the dog was neglected, he did not have any veterinary training. Upon being questioned by the trial court, Officer Franklin testified that Lee's dog was at the Curll home for several months.

Officer Dwayne Burress of the Franklin Police Department (FPD) testified that sometime before the dog died, he responded to a call on Oak Drive regarding a hamster that had been killed by a dog. Officer Burress spoke with the complainant, who "pointed the dog out." The dog, which Officer Burress described as "a pretty large Rottweiler," was in the Appellant's back yard. Officer Burress knocked on the Appellant's door, and the Appellant answered. Officer Burress informed the Appellant that one of his dogs "got off the chain and killed the neighbor's pet." Officer Burress suggested that the Appellant buy the neighbor another hamster, and the Appellant "agreed that that would be the right thing to do."

Officer Burress testified that about one week later, he saw the same dog walking on Sycamore. He opened the back door of his patrol car and told the dog to jump in, which it did. Officer Burress drove the dog to the Appellant's house and told the Appellant that he needed to re-chain the dog. The Appellant told Officer Burress that the dog did not belong to him and told Officer Burress to "take it somewhere." Officer Burress advised the Appellant that he could not transport a dog in the back of his patrol car and that he did not have anywhere to take the dog. The officer also told the Appellant that "since it was chained at his house he'd need to put it back on the chain."

On cross-examination, Officer Burress testified that Animal Control could have taken the dog but that it was against FPD policy and procedure to transport an animal. He acknowledged that the dog was in good condition when he saw it.

Dr. Robin Haines, a veterinary diagnostician for the Tennessee Department of Agriculture's Kord Diagnostic Laboratory, testified as an expert in veterinary pathology that she performed an autopsy on the dog. She said that the dog was a Rottweiler or Rottweiler mix and that she could "clearly see all of the ribs through the skin." The dog's hip bones were "prominent," and the dog had "very little if [any] fat on it." Dr. Haines stated that she assessed the dog's condition by giving it a body condition score. She explained that a body condition score was measured on a scale of one to five with a very

obese animal having a score of five, a normal animal with normal muscle mass and amounts of fat having a score of three, and an emaciated animal having a score of one. The dog in this case had a body condition score of one, which was "based on the prominence of the bones externally and the absence of any fat within the dog." Given that the dog showed no other signs of illness, "this body condition [was] not compatible with life."

Dr. Haines testified that when she examined the dog internally, she found "serous atrophy of fat," meaning that "the fat that had been [in the body] has been reabsorbed by the body and there [was] nothing left." She said that the areas around an animal's heart, kidneys, and intestines were some of the last places from which fat would be absorbed before the animal died of starvation and that she found no fat in any of those locations in the deceased dog. A brown fluid and a very fibrous material similar to mulch or bark was in the dog's digestive system. She stated, "And so this is something that we often see in animals that are -- that are starved, that don't have any food available, that they will eat anything within their environment." Dr. Haines found three heartworms in the dog's heart. However, the worms did not affect the dog's heart or lungs and did not cause the dog's emaciation. Dr. Haines also did not find any parasites in the dog's feces or any disease within the dog's tissues that explained the dog's emaciation. She said the dog's only cause of death was extreme weight loss due to starvation. She stated that if the dog was in very good condition initially and then was deprived of food completely, it would have taken weeks or months for the dog to have ended up in its emaciated condition.

On cross-examination, Dr. Haines acknowledged that she diagnosed the dog with emaciation and heartworms. Each of the three heartworms measured eight to ten centimeters in length, and Dr. Haines acknowledged that heartworms could be fatal. She stated that if the dog was in good condition with a body score of three on February 5 or 6, 2014, then the dog could not have had a body condition score of one just ten days later.

Carole Gray, the Williamson County Circuit Court Deputy Clerk, testified that the Appellant's trial originally was scheduled for February 4, 2015. Darius Lee was subpoenaed for trial but was not served with the subpoena because he could not be located. The Appellant's trial was rescheduled due to the inability to locate Lee, and another subpoena was issued. However, Lee still could not be located. At the conclusion of Gray's testimony, the State rested its case.

The defense recalled Officer Franklin. He acknowledged that according to Darius Lee, Lee last saw the dog on February 5 or 6, 2014, and that the dog looked fine at that time. On cross-examination, Officer Franklin acknowledged that he was unable to confirm Lee saw the dog on February 5 or 6.

- 4 -

LaTonya Curll testified that she and the Appellant had been married for nine years and had three children. At some point, Darius Lee brought his dog to the Curll home. Mrs. Curll said that she and the Appellant agreed to take care of the dog "under certain circumstances, that the dog could stay in our yard, yes." However, Lee was "supposed to come by at least once a week to check on the dog" and was supposed to provide the Curlls with money or food to feed the dog. Mrs. Curll said that she was the only employed person in her household and that money was "tight."

Mrs. Curll testified that Lee tried to "keep up" with the agreement but that he "slacked off" in December 2013. In January 2014, the Appellant repeatedly told Lee to come and get the dog. Lee came to the house about one week before the dog died and was supposed to take it with him, but he did not take the dog. The dog died on Sunday, February 16, 2014. Mrs. Curll said that the police had brought the dog back to her house at least twice before it died. The dog was not vicious but had "snapped at" Mrs. Curll, and Mrs. Curll was "timid" around the dog. She said that she also was charged with a crime in this case and that she pled guilty.

On cross-examination, Mrs. Curll acknowledged having a prior conviction for theft. She also acknowledged giving a statement in this case in which she said Lee brought his dog to her home in August 2013. She said that she was wrong and that Lee actually brought the dog to her house in November 2013.

Mrs. Curll acknowledged that Lee was supposed to take care of the dog but that he did not even live in Franklin. She also acknowledged that while the dog was at her home, it was in the care of her and the Appellant. She said that the second dog was the "family dog," and she acknowledged that her dog was well-cared-for. She said that she provided food to both dogs, and she could not explain why Lee's dog was emaciated. She acknowledged that she and the Appellant were in possession of Lee's dog but said that they could not make any decisions about the dog because it did not belong to them. She said she and the Appellant were "like a babysitter" for the dog.

Officer Burress was recalled by the Appellant and testified that when he went to the Curll home in response to the dead hamster call, the dog "had already been placed back on its chain" in the Appellant's back yard. The dog was in good condition. The dog was not aggressive, and Officer Burress petted and played with the dog. He said he thought he went to the Curll home in December 2014 but that he may have gone there in December 2013.

The Appellant testified that he was forty years old, an Army veteran who served in Iraq and Korea, and a Judge Advocate with the American Legion. He said he suffered from post-traumatic stress disorder, had poor circulation in his hands and feet, and could

not sleep. At the time of trial, the Appellant was unable to work and had applied for disability and social security benefits.

The Appellant testified that he had known Darius Lee for fifteen years and that Lee knew he owned Rottweilers. In November 2013, Lee was getting ready to move and did not have a place to keep his dog, so he asked if he could keep the dog in the Appellant's back yard. Lee brought the dog to the Curll home about two weeks before Thanksgiving in 2013 and was supposed to "come and see about the dog and make sure the dog [had] every thing." The Appellant said he let Lee know that he did not have enough money to care for two dogs and that Lee had to "come see about your dog."

The Appellant testified that the first week the dog was at his house, Lee came twice. Lee also brought a doghouse for the dog. Lee then took the dog from the Curll home and kept it about one week because Lee's children missed the dog. Lee brought the dog back to the Appellant's back yard the first or second week of December 2013. The Appellant said the dog "broke out every night," did not like to be confined, and "did not prefer dog food." The Appellant stated, "It was plenty of mornings I woke up with blood on my porch, my side porch, my front porch, where this dog would actually go out and hunt." He described the dog as a "hunter dog" and said the dog was depressed and would not eat when it was chained.

The Appellant testified that Officer Burress came to his house several times. The officer first came to the house after Lee's dog killed a neighbor's pet hamster. Officer Burress came to the Appellant's house again to return the dog after it "broke loose." The Appellant told Officer Burress that he did not own the dog and asked the officer to take the dog away. However, Officer Burress refused and told the Appellant to take the dog to "the pound."

The Appellant testified that after Lee brought the dog back to his house in December 2013, he did not see Lee again until February 12, 2014. On that day, Lee claimed he had come to get the dog. The Appellant told Lee that he and his family were on their way to basketball practice and that "either you are taking the dog now or you will get it later." Lee said he would come back to get the dog later, and the Appellant told him, "[Y]ou need to go out there and make sure the dog is fed." When the Appellant and his family returned from basketball practice, the dog was still there. The Appellant did not see Lee again.

The Appellant testified that on February 14, 2014, two days before the dog died, he was arrested for driving on a suspended license and "some other things." He remained in custody until June 1, 2014. He said that he felt "bad" for what happened to the dog and that he did volunteer work at Animal Control every weekend while he was in jail.

- 6 -

On cross-examination, the Appellant testified that he and Lee were "like brothers" and, therefore, that he did not want to take Lee's dog to the pound. The Appellant telephoned Lee "constantly" and told him to come and get the dog, and Lee kept assuring the Appellant that he would take the dog. Lee stopped by the Appellant's house but always made excuses as to why he could not take the dog with him. The Appellant stated, "I gave him [an] area in my back yard to place his dog, that's it. That was all it was supposed to be about." The Appellant did not want to send his friend's dog to "jail" by taking it to the pound, and he did not think he had the right to give the dog away because he did not own the dog.

The Appellant testified that the dog was a nuisance in the neighborhood and that Officer Burress could have had Animal Control take the dog because the dog was running loose. He said that when Officer Burress returned the dog to his house in the patrol car, "I verbally made it real clear that I'm not no longer holding responsibility for this dog because of its actions and you need to take it[.]" He stated that Officer Burress should have written him a citation "for all the times this dog broke loose, caused havoc in the neighborhood" and that "they didn't hold me responsible for this dog's actions when it was loose." He said that he was not blaming Officer Burress for the dog's death but that he was blaming the officer for not taking the dog away. The Appellant acknowledged having two prior convictions for fraudulent use of a credit card in 2006 and one prior felony conviction in 2008.

At the conclusion of the Appellant's testimony, the jury convicted him as charged of aggravated cruelty to an animal, a Class E felony. After a sentencing hearing, the trial court sentenced him as a Range II, multiple offender to four years in confinement.

## II. Analysis

### A. Jury Instruction

The Appellant contends that the trial court erred in its instruction of the offense to the jury. Specifically, he claims that the trial court wrongfully instructed the jury that the "sadistic" element of the offense could be satisfied by proving that he engaged in "excessive cruelty" rather than taking "delight in the cruelty." The State argues that the trial court properly instructed the jury and that, regardless, any error was harmless. We agree with the State.

Tennessee Code Annotated section 39-14-212(a) provides that "[a] person commits aggravated cruelty to animals when, with aggravated cruelty and with no justifiable purpose, the person intentionally kills or intentionally causes serious physical

injury to a companion animal." Tennessee Code Annotated section 39-14-212(b)(1) defines "aggravated cruelty" as "conduct which is done or carried out in a depraved and sadistic manner and which tortures or maims an animal, including the failure to provide food and water to a companion animal resulting in a substantial risk of death or death."

Before trial, the Appellant filed a motion requesting that the trial court provide the jury with a special jury instruction defining "depraved" and "sadistic," which were not defined in the statute. The requested instruction, directly quoted from a Tennessee Attorney General Opinion, stated as follows:

> "Depraved" has been defined as "morally corrupt; perverted." "Sadistic" has been defined as "deriving of sexual gratification or the tendency to derive sexual gratification from inflicting pain or emotional abuse on others; deriving of pleasure, or the tendency to derive pleasure, from cruelty; extreme cruelty." American Heritage Dictionary, 4th Edition (2000).
>
> In order to violate the statute with respect to aggravated cruelty, a person must intentionally torture or maim an animal by engaging in conduct in a morally corrupt or perverted manner or by deriving pleasure or sexual gratification from inflicting pain or cruelty on an animal.

Tenn. Atty. Gen. Op. No. 08-124.

The State responded to the motion, arguing that the trial court should provide the definitions of "depraved" and "sadistic" that this court "adopted" in State v. Christopher Lee Barnett, No. M2009-00756-CCA-R3-CD, 2010 WL 3822880 (Tenn. Crim. App. at Nashville, May 20, 2010). As this court stated in that case:

> Because the statute does not define either "depraved" or "sadistic," we consider the ordinary meaning of these words in evaluating the sufficiency of the evidence. Merriam-Webster's Dictionary defines depraved as "marked by corruption or evil; especially: perverted." It provides two definitions of sadistic: (1) "a sexual perversion in which gratification is obtained by the infliction of physical or mental pain on others (as in a love object)"; and (2) a "delight in cruelty" or "excessive cruelty."

. . . .

> In our view, striking a dog multiple times in the head, forcefully filing away his teeth with only marginally effective anesthesia, and then angrily kicking the unconscious and bleeding dog is behavior "marked by corruption or evil" and of "excessive cruelty." Therefore, we conclude the record adequately supports the jury's finding that the Defendant intentionally carried out severe physical injury to [the dog] through depraved and sadistic means that tortured and maimed [the dog].

Christopher Lee Barnett, No. M2009-00756-CCA-R3-CD, 2010 WL 3822880, at *13, 14 (citations omitted).

According to the trial transcript in the present case, the trial court defined "aggravated cruelty" to the jury as provided in Tennessee Code Annotated section 39-14-212(b)(1). The court then defined "'depraved'" as "'morally corrupt; perverted.'" The court defined "'sadistic'" as "deriving sexual gratification or the tendency to derive sexual gratification for inflicting pain or emotional abuse on others; deriving of pleasure, or the tendency to derive pleasure, from cruelty; extreme cruelty; or a delight in cruelty; or excessive cruelty."

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011). We have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). Generally, a charge is "erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (internal quotations and citations omitted). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005).

Turning to the instant case, we conclude that the trial court properly instructed the jury that "sadistic" meant not only "a delight in cruelty" but "excessive cruelty." When

our Code does not define a term, our courts give the words of a statute "'their ordinary and natural meaning,' and we may refer to dictionary definitions where appropriate." State v. Majors, 318 S.W.3d 850, 859 (Tenn. 2010) (quoting State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985)). This court has referred to the dictionary definition of "sadism" as either "a delight in the cruelty" or "excessive cruelty." See State v. Billy Stewart, W2013-02562-CCA-R3-CD, 2015 WL 3509397, at *11 (Tenn. Crim. App. at Jackson, June 4, 2015); Christopher Lee Barnett, No. M2009-00756-CCA-R3-CD, 2010 WL 3822880, at *13. Therefore, we conclude that the trial court properly instructed the jury that "sadism" was defined as "a delight in cruelty; or excessive cruelty."

In any event, at the hearing for the Appellant's motion for new trial, the trial court concluded that any error in the "sadistic" definition was harmless because "[t]he last clause of that section expressly states that the crime the Defendant was found guilty of, failing to provide food or water to a dog, falls under the definition of 'aggravated cruelty.'"[1] We agree with the trial court. The Appellant contends that the phrase "including the failure to provide food and water" in Tennessee Code Annotated section 39-14-212(b)(1) modifies the words "tortures or maims," not the word "conduct," and that the statute is ambiguous as to whether the legislature intended deprivation of food to be an example of "aggravated cruelty." However, we believe that a comparison of the statute for cruelty to animals with the statute for aggravated cruelty to animals supports the trial court's conclusion. The former specifies that when a person intentionally or knowingly fails unreasonably to provide necessary food and water to an animal in the person's custody, the person commits the offense of cruelty to animals, a misdemeanor. See Tenn. Code Ann. § 39-14-202(a)(2), (g)(1). When that failure to provide food and water is intentional and results in death, though, the offense logically is elevated to that of aggravated cruelty to animals, a felony. Therefore, we agree with the trial court that any error in the "sadistic" instruction was harmless. See Tenn. R. App. P. 36(b).

## B. Sufficiency of the Evidence

Having concluded that the trial court properly instructed the jury on the offense, we next turn to the sufficiency of the evidence to support the conviction. The Appellant claims that the evidence is insufficient because it did not show that he consciously wanted the dog to die. The State argues that the evidence is sufficient. We agree with the State.

---

[1] According to the Appellant's brief, the trial court "seemingly agree[d]" at the hearing for his motion for new trial that the jury instruction on "sadism" was incorrect. However, the trial court's written order denying the Appellant's motion for new trial plainly states, "The Court did not err in its definition of 'sadistic.'"

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. <u>Id.</u> Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" <u>State v. Rice</u>, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>Dorantes</u>, 331 S.W.3d at 379 (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, a person commits aggravated cruelty to animals when, with aggravated cruelty and with no justifiable purpose, the person intentionally kills a companion animal. Tenn. Code Ann. § 39-14-212(a). As stated above, "aggravated cruelty" is defined as "conduct which is done or carried out in a depraved and sadistic manner and which tortures or maims an animal, including the failure to provide food and water to a companion animal resulting in a substantial risk of death or death." Tenn. Code Ann. § 39-14-212(b)(1). "[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(18).

Taken in the light most favorable to the State, the evidence shows that Darius Lee brought his dog to the Curll home in November 2013. When Officer Franklin went to the home on February 16, 2014, he found the dog deceased, emaciated, and chained to a tree. Empty food and water pans were nearby, and very little feces was in the area. Dr. Haines

testified that there was no fat on the dog; that mulch or bark was in the dog's digestive system, which was common when an animal did not have anything else to eat; and that the dog would have had to have been deprived of food for weeks to months in order for it to have been in such an emaciated condition. She concluded that the dog died of starvation. Another dog in the back yard, though, was well-fed. The Appellant never testified that he or anyone in his family fed the dog. However, he readily admitted that he did not want the dog and even testified that he told Officer Burress, "I verbally made it real clear that I'm not no longer holding responsibility for this dog because of its actions and you need to take it[.]" Officer Burress advised the Appellant that he could not transport the dog and that the Appellant should take the dog to "the pound." The Appellant refused to do so. A reasonable jury could determine from the evidence that by intentionally depriving the dog of food and water, which are basic necessities of life, the Appellant intended to kill the dog. Thus, the evidence is sufficient to support the conviction.

## C. Ineffective Assistance of Trial Counsel

Finally, the Appellant contends that he received the ineffective assistance of counsel because trial counsel failed to call a veterinary expert to testify on his behalf and failed to file a motion to suppress Officer Franklin's search of his back yard and the seizure of the dog's body without a warrant. The State argues that the Appellant has failed to show that he received the ineffective assistance of trial counsel. We agree with the State.

The Appellant raised the issue of ineffective assistance of trial counsel in his motion for new trial. At the hearing on the motion, trial counsel testified for the Appellant that he was appointed to the Appellant's case. The Appellant did not confess to trial counsel that he starved the dog but asserted that the dog was not his responsibility. Trial counsel said that the Appellant "did mention that at one point he was feeding the dog some of his own dog's food" but that the Appellant's "main focus was always that the dog was somebody else's responsibility." Trial counsel knew a veterinary expert was going to testify for the State and thought a veterinarian could help trial counsel prepare the Appellant's case. Trial counsel said he tried to find a veterinary expert that would accept funding from the Administrative Office of the Courts by posting two referral requests on the Tennessee Association of Criminal Defense Lawyers (TACDL) website. Trial counsel posted the first request on December 16, 2014, and the second request on February 2, 2015, but no one responded with a referral. Trial counsel said that if he had received a referral for a veterinary expert, he "would have most likely reached out and at least had a conversation" with the veterinarian. However, based on Dr. Haines's autopsy report and Officer Franklin's observations of the dog, trial counsel "was not optimistic

that [he] could successfully challenge the State's proof as to the cause of death of the dog."

Trial counsel testified that he reviewed Officer Franklin's report and listened to the testimony at the preliminary hearing. Trial counsel did not file a motion to suppress because it was his "understanding" that Mrs. Curll allowed Officer Franklin to go into the back yard and that the officer seized the dog pursuant to the plain view exception to the warrant requirement. However, trial counsel never spoke with Mrs. Curll before trial. Trial counsel spoke with the Appellant on the telephone "multiple times" and asked that the Appellant have Mrs. Curll call counsel. Trial counsel also sent the Appellant a letter, asking that the Appellant have Mrs. Curll telephone counsel, but counsel "was never able to connect up with her for whatever reason."

On cross-examination, trial counsel testified that the Appellant never told him that the Appellant did not feed the dog. The Appellant also did not tell him that the Appellant fed the dog. Instead, the Appellant repeatedly told trial counsel that the dog was Lee's responsibility. The Appellant claimed that Lee "stopped providing food and/or money for food," that the Appellant could not feed the dog from his own dog's food, and that the Appellant demanded repeatedly that Lee come and get the dog. The Appellant also claimed that he told Officer Burress to take the dog. Officer Burress refused, so the Appellant was "forced" to keep it. Trial counsel acknowledged that the Appellant "wanted to focus on the dog not being his and the dog escaping."

Trial counsel testified that he tried to elicit testimony from Dr. Haines that was favorable to the defense, and she testified on cross-examination that she found some heartworms in the dog. Regarding trial counsel's not filing a motion to suppress, he acknowledged that the unrefuted testimony at the preliminary hearing was that Mrs. Curll led Officer Franklin into the back yard. Trial counsel did not speak with Mrs. Curll, though, until after the Appellant's trial.

On redirect examination, trial counsel was asked if he thought the Appellant's claim that the dog did not belong to the Appellant was a "viable" defense. Trial counsel answered, "Well, yes. I mean the State would have to prove that he had responsibility for the dog, so, yes, that is part of that I believe."

Dr. Katherine D. Zimmerman testified for the Appellant as an expert in veterinary forensics that she reviewed photographs of the dog, various laboratory reports, Dr. Haines's autopsy report, and Dr. Haines's trial testimony. Dr. Zimmerman said that the only way to diagnose a dog with starvation was to "rule out everything else," such as infectious causes, toxic causes, viruses, bacteria, environmental issues, parasites, funguses, genetic diseases, inheritable diseases, and autoimmune diseases. Regarding Dr.

Haines's assigning the dog a body condition score of one on a scale of one to five, Dr. Zimmerman stated that she used a scale of one to nine because it was more accurate. She explained that on her scale of one to nine, a dog with a score of one was in imminent threat of health and life but that "[y]ou can be a one and do just fine." She stated that she scored the dog in this case "[a]bout a two." The dog still had muscle in its back and did not have a body condition score that was incompatible with life. Dr. Zimmerman said that in order for a dog to starve to death, the dog had to have a body condition score of one or lower on her scale and serous heart atrophy. Dr. Zimmerman reviewed photographs of the dog's heart in this case and did not see any heart atrophy. Although the dog's heart did not have a normal amount of fat around it, the heart still had a "shadow" of fat, meaning the fat was not completely gone.

Dr. Zimmerman testified that Dr. Haines's testing for parasites and failure to find parasites was "useless" because parasite testing in feces had to be conducted within twelve to twenty-four hours of the feces leaving the dog's body or the dog dying. The parasite testing in this case was conducted five days after the dog's death. Dr. Zimmerman said that the dog's mesentery was "regrettably very lacy" and a "clear example of fat atrophy because the dog did not have sufficient caloric intake for whatever reason." However, the dog's liver appeared normal with no signs of hepatic lipidosis. The dog's bone marrow was not analyzed. Dr. Haines's report contained no commentary as to the status of the dog's lymphatic system or whether fleas were even on the dog, which could have caused anemia. Dr. Zimmerman noted that the forensic necropsy reports she wrote were usually six to ten pages in length but that Dr. Haines's report contained just seventeen sentences.

Dr. Zimmerman testified that no diagnostic assays were conducted to check the dog for infectious diseases; that no blood testing was performed to check for viruses; and that the dog's gastrointestinal system was not tested for occult blood, which could have helped determine why the dog was not eating. Fresh tissue was not saved to test for toxins or poisons, and the dog was not tested for rabies. Dr. Zimmerman was asked to list "any other things than starvation that could have killed this dog," and she stated that the dog could have died from rabies, "a huge number of toxic causes," parasites, autoimmune diseases, tetanus, Salmonella, E. coli, and tick-borne diseases. The Kord Laboratory did not rule out any of those conditions. Dr. Zimmerman said that finding mulch in a dead dog was "very interesting" because mulch, particularly chocolate mulch, could be toxic to a dog and kill the dog from arsenic poisoning. Dr. Zimmerman was asked to state her conclusions regarding the dog's death, and she said,

> There is insufficient evidence for me to make a diagnosis [in] this case. However, based on what I do have available, mulch intoxicosis would have to go way above starvation because in

starvation we need to see that serous fat atrophy. It is simply not there. We need documentation of the bone marrow. It's simply not there. We need a small liver. I don't see one and no comment was made about it. We need these things. We need the eyes to be sunken back in because they've gotten rid of the fat. The picture of the head of this dog looks perfectly normal, the eyes do. These are all things that we kind of need to have to rule in starvation because starvation is something that you rule in by excluding everything else.

In this case we actually have a logistical cause of death that is not improbable and that is it ate mulch, it was full of arsenic and the dog died of arsenic poisoning and there's just not enough information to do any more than that.

On cross-examination, Dr. Zimmerman testified that she did not speak with Dr. Haines about Dr. Haines's findings or testimony. In August 2015, Dr. Zimmerman contacted the Kord Laboratory to talk about the case but was told the case could not be discussed because it was in litigation. Dr. Zimmerman said that the facts in evidence were insufficient for anyone to make a diagnosis in the dog's death; that the facts in evidence did not support Dr. Haines's conclusion of starvation; and that if Dr. Haines relied on facts not in evidence, then she should have stated them in writing. Dr. Zimmerman said that Dr. Haines "wrote a 17-sentence necropsy report" and that "[y]ou can't say anything in 17 or 18 sentences." Dr. Zimmerman said that although Dr. Haines testified as an expert in veterinary pathology, "I have a suspicion that she lacks clinical experience to go along with her specialty in pathology."

Dr. Zimmerman acknowledged that other veterinarians also used the one-to-five scale for body condition. However, even on that scale, the dog in this case scored a "one and a half," not a one. Dr. Zimmerman said that in order for the dog to have scored a one, the dog had to be "a skeleton with fur on it." Dr. Zimmerman stated that the photographs in this case showed the dog still had muscle and that she had seen dogs in much worse condition "do just fine." Mulch in the dog's digestive system supported her conclusion of mulch intoxication. She stated that although mulch intoxication was "still a guess," mulch intoxication was "[m]uch more reasonable than starvation." She said she agreed with Dr. Haines's conclusion that the three heartworms in the dog's heart were not enough to cause any disease.

The Appellant's ten-year-old son testified that he saw the Appellant feed the dog when the Appellant fed the family dog. The Appellant's son was asked how often the Appellant fed the dogs, and the boy answered, "Maybe like he would feed them one day

and then not the day after but that next day." The Appellant never told his son that he hated the dog or that the family was no longer going to feed it. About two weeks before the dog died, the dog would not eat and was not as active as it used to be.

On cross-examination, the Appellant's son testified that he was nine years old when the dog died. He talked to appellate counsel, his mother, and the Appellant about his testimony. Both of his parents told him to tell the truth. The Appellant's son said that he did not remember the Appellant's being upset with Darius Lee about Lee's leaving the dog at the house and that he saw the Appellant feed the dog two or three times per week.

Mrs. Curll testified that on February 16, 2014, she went "up the street" to borrow a shovel. When she returned home, Officer Franklin "pulled up" as she pulled into her driveway. She then stated as follows:

> [H]e just said he heard there was a dead dog and I was like, yes, it's in the backyard. And as he was -- as he was talking he was walking so he was already getting out of his truck and he was, you know, walking toward the backyard so I walked back to the backyard with him and we kind of both saw it at the same time like he raised up the Igloo house, the top of it.

She explained that the doghouse came in two pieces but that the pieces were not put together. The dog had crawled under the top piece, and Officer Franklin had to turn over the piece in order to see the dog. Officer Franklin told Mrs. Curll that "this is a crime scene, I'm going to have to take the dog." He did not ask Mrs. Curll for permission to collect the dog's body.

On cross-examination, Mrs. Curll acknowledged that she let Officer Franklin know that she did not own the dog and that she was not responsible for the animal. She said that Officer Franklin was "already walking toward the back of the house" when she told him that "yes, the dog is in the backyard" and that she started walking with him. She never told him that he could not go into the back yard, and he never asked if he could go there. She said, "We just walked."

The Appellant called Officer Franklin as his last witness. Officer Franklin acknowledged that he could not walk into Mrs. Curll's back yard without a search warrant or obtaining her permission. He also acknowledged that when he saw the dog's body, he did not know that a crime had occurred.

On cross-examination, Officer Franklin testified that when Mrs. Curll came to the front of the house, he told her why he was there. He said that he asked "if we could go

back there and take a look" and that Mrs. Curll "escorted" him into the back yard. He stated that "[s]he said that she had nothing to do with that dog whatsoever" and that she allowed him to take the dog's body.

In a written order, the trial court denied the Appellant's motion for new trial. Regarding the Appellant's claim that counsel was ineffective for failing to call a veterinary expert to testify at trial, the trial court found that counsel was not deficient for failing to obtain an expert because counsel decided to focus the defense strategy "on this issue that the dog was not [the Appellant's] responsibility." The court noted that the Appellant was "extremely passionate" about that issue at trial, even blaming law enforcement for the dog's death because an officer brought the dog back to the Appellant's house after it escaped. The trial court also found that, in any event, trial counsel testified that he attempted to find an expert but that the attempts were unsuccessful. The court also found that the Appellant failed to demonstrate that he was prejudiced by trial counsel's failure to have an expert testify because Dr. Zimmerman's testimony at the motion for new trial hearing "did not show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[']" Regarding the Appellant's claim that trial counsel was ineffective for failing to file a motion to suppress the evidence, the trial court found that counsel was not deficient because (1) the Appellant "disclaimed his interest in the dog," and, therefore, did not have a subjective expectation of privacy in the dog's body and (2) Mrs. Curll consented to the officer's entering the back yard.

On direct appeal, as in a post-conviction proceeding, an appellant is required to prove the ineffective assistance of counsel by clear and convincing evidence. State v. Burns, 6 S.W.3d 453, 461 n.5 (Tenn. 1999); see Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See Burns, 6 S.W.3d at 461. We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458.

- 17 -

However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When an appellant seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [appellant] bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the [appellant] must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the appellant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Generally,

> [b]ecause [an appellant] must establish both prongs of the
> test, a failure to prove either deficiency or prejudice provides
> a sufficient basis to deny relief on the ineffective assistance
> claim. Indeed, a court need not address the components in
> any particular order or even address both if the [appellant]
> makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Regarding the Petitioner's claim that trial counsel was ineffective for not having a veterinary expert testify on his behalf at trial, the trial court found that counsel was not deficient because counsel decided to focus the defense strategy on the Appellant's claim that the dog was not his responsibility. At the motion for new trial hearing, trial counsel testified that he talked with the Appellant about the case. The Appellant never confessed to starving the dog but did not tell trial counsel he fed the dog. Trial counsel explained that he chose to focus the defense on the Appellant's claim that the dog was not the Appellant's responsibility because the Appellant wanted him to focus on that defense and because he did not think he could successfully challenge the State's proof regarding the dog's cause of death. Criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. 1996). "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Moreover, "an accused is not deprived of the effective assistance of counsel because a different procedure or strategy might have produced a different result." Vermilye v. State, 754 S.W.2d 82, 85 (Tenn. Crim. App. 1987). This court may not "second guess" counsel's tactical or strategic choices made in

the course of trial. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The Appellant has not proven by clear and convincing evidence that trial counsel was deficient by making this strategic choice.

The trial court also found that, in any event, the Appellant was not entitled to relief because trial counsel attempted, without success, to find an expert and because Dr. Zimmerman's testimony on the Appellant's behalf would not have changed the outcome of the trial. Trial counsel testified that he tried to find a veterinary expert by posting two requests for a referral on the TACDL website. The Appellant has not explained what more counsel should have done to find an expert. In addition, although Dr. Zimmerman strongly disputed Dr. Haines's conclusion that the dog died of starvation, Dr. Zimmerman could not say the dog did not die of starvation. Instead, she said the dog more likely died from mulch intoxication. However, even that diagnosis was "still a guess." Regardless, Dr. Haines testified that mulch was often found in starving animals because they did not have anything else to eat. Therefore, even if the dog died of mulch poisoning, the dog's death resulted from the Appellant's intentional withholding of food. Thus, we agree with the trial court that the Appellant has failed to show that counsel was deficient for not having an expert testify on his behalf or that he was prejudiced by any deficiency.

As to the Petitioner's claim that trial counsel should have filed a motion to suppress Officer Franklin's search of the Appellant's back yard and the seizure of the dog's body without a warrant, both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable, and thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). Our supreme court has said, "It is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." State v. Jackson, 889 S.W.2d 219, 221 (Tenn. 2003). The prosecution bears the burden of proving valid consent. See State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). Furthermore, "'[t]he existence of consent and whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting McMahan, 650 S.W.2d at 386).

At the motion for new trial hearing, trial counsel testified that he did not file a motion to suppress because Officer Franklin testified at the preliminary hearing that Mrs. Curl gave him consent to enter back yard. Officer Franklin later testified at the motion

for new trial hearing that he told Mrs. Curll why he was there, that he asked her "if we could go back there and take a look," and that she "escorted" him into the back yard. The trial court found that Mrs. Curll consented to the search.

The Appellant claims that Officer Franklin could not infer Mrs. Curll's consent from her silence. As noted by the Appellant, our supreme court has held that a person's merely stepping back from the door of a home after police officers identified themselves was not an invitation for the officers to enter the residence. State v. Clark, 844 S.W.2d 597, 599 (Tenn. 1992). The instant case, though, is significantly different from Clark. Officer Franklin testified that after he asked Mrs. Curll if he could look in the back yard, she "escorted" him there. We note that his testimony was consistent with his trial testimony that she "led" him into the back yard. Although Mrs. Curll testified that Officer Franklin was already walking toward the back yard when she joined him, the trial court obviously accredited the officer's testimony. Therefore, the Appellant has failed to demonstrate that counsel was deficient for failing to file a motion to suppress on the basis of the officer's warrantless search.

As to the Appellant's claim that counsel should have filed a motion to suppress based upon the officer's warrantless seizure of the dog's body, the trial court found that the Appellant had no subjective expectation of privacy in the dog. Again, we agree with the trial court. Officer Franklin testified at the motion for new trial hearing that Mrs. Curll told him that "she had nothing to do with that dog whatsoever," a position steadfastly maintained by the Appellant before, during, and after the trial. As our supreme court has explained, "[W]hen a defendant disclaims an interest in the object of a police investigation at the time of the search, then this fact alone will deprive a defendant of any expectation of privacy, irrespective of considerations such as ownership or possession." State v. Ross, 49 S.W.3d 833, 841 (Tenn. 2001). In any event, Officer Franklin testified at trial that when he entered the back yard, the dog was lying in plain view. Items fall within the "plain view" exception to the warrant requirement if (1) the seized items were in the officer's plain view, (2) the officer was rightfully in the position from which he or she viewed the items, and (3) the items had an incriminating nature that was immediately apparent to the officer. State v. Cothran, 115 S.W.3d 513, 524-25 (Tenn. Crim. App. 2003). Officer Franklin was rightfully in the back yard because Mrs. Curll consented to his being there, and the incriminating nature of the deceased and emaciated dog, chained to a tree, with no food or water present was readily apparent to the officer. Although Mrs. Curl testified at the motion for new trial hearing that Officer Franklin had to lift part of a doghouse in order to see the dog, appellate counsel did not ask Officer Franklin about his having to lift the doghouse. Neither the officer nor Mrs. Curll mentioned at trial that the officer had to lift the doghouse in order to see the dog. It was the Appellant's burden to show that trial counsel was deficient for failing to file the

motion and that he was prejudiced by the deficiency. We conclude that the Appellant has failed to meet that burden and, therefore, that he is not entitled to relief.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE